**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **DANIELLE MAYO o/b/o D.L.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )    **Case No. 4:11CV201 LMB** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Danielle Mayo for Supplemental Security Income benefits on behalf of

her minor son, D.L., under Title XVI of the Social Security Act.  This case has been assigned to

the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is

being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff has filed a Brief in

Support of the Complaint.  (Document Number 18).  Defendant has filed a Brief in Support of the

Answer.  (Doc. No. 20).

**Procedural History**

Danielle Mayo filed an application for Supplemental Security Income (SSI) benefits on

behalf of her son, D.L. ("plaintiff") on March 12, 2008, alleging a disability onset date of January

12, 1999.  (Tr. 97-99).  The application was denied initially and, following an administrative

hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ)

dated November 4, 2009.  (Tr. 61-66, 25-28).  Ms. Mayo thereafter filed a request for review

with the Appeals Council of the Social Security Administration (SSA), which was denied on December 21, 2009.  (Tr. 15, 10-12).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  <u>See</u> 20 C.F.R. §§ 404.981, 416.1481.

### **Evidence Before the ALJ**

**A.     ALJ Hearing**

Plaintiff's administrative hearing was held on September 29, 2009.  (Tr. 31).  Plaintiff was present and was represented by counsel.  (<u>Id.</u>).  Ms. Mayo, plaintiff's mother, was also present. (<u>Id.</u>).

The ALJ first examined plaintiff, who testified that he was ten years old, and lived in a house with his mother, his seventeen-year-old sister, his thirteen-year-old brother, and his two-year-old sister.  (Tr. 35).  Plaintiff stated that he lived with his grandmother until he was five years old.  (Tr. 36).

Plaintiff testified that he had his own room at his mother's home.  (<u>Id.</u>).  Plaintiff stated that his younger sister occasionally slept with him.  (<u>Id.</u>).

Plaintiff testified that he helped his mother by cleaning his room.  (Tr. 37).  Plaintiff stated that he picked up his toys, put his dirty clothes in the hamper, and swept his room.  (<u>Id.</u>). Plaintiff testified that on days he does not have school, he wakes up, "wash[es] up," dresses, and eats breakfast.  (<u>Id.</u>).  Plaintiff stated that he likes to eat sausage and bacon sandwiches for breakfast.  (<u>Id.</u>).  Plaintiff testified that his mother usually cooks breakfast, although his older brother or sister cook for him if his mother is unavailable.  (Tr. 38).  Plaintiff stated that his mother does not work, but she attends court frequently.  (<u>Id.</u>).

Plaintiff testified that, after he eats breakfast, he lies down and watches televison.  (<u>Id.</u>).

Plaintiff stated that he likes to watch cartoons. (Id.). Plaintiff testified that he plays outside with his two pit bull dogs. (Id.). Plaintiff stated that he feeds his dogs and bathes them. (Tr. 39).

Plaintiff testified that he also plays with friends outside. (Id.). Plaintiff named seven friends. (Id.). Plaintiff testified that he and his friends play tag, and football. (Id.). Plaintiff stated that his older sister takes him to the park with his younger sister. (Tr. 40). Plaintiff testified that he plays on the playground at the park. (Id.). Plaintiff stated that he has a swimming pool in his back yard, and that he swam the previous summer. (Id.).

Plaintiff testified that he walks to school with his uncle. (Id.). Plaintiff stated that he has friends in his class, and named six friends. (Tr. 41). Plaintiff testified that he was in fourth grade. (Id.). Plaintiff stated that he stays in the regular classroom all day. (Id.). Plaintiff testified that he was taking Math, Social Studies, and Science classes. (Id.). Plaintiff stated that, at recess, he plays tag, runs, plays soccer, and plays kickball. (Id.).

Plaintiff testified that he gets in trouble at school for fighting. (Tr. 42). Plaintiff stated that other children hit him, and he hits them back. (Id.). Plaintiff stated that he had been in trouble four to six times that year for fighting, and for running around the building. (Id.).

Plaintiff testified that he received one "A," "B"s, and one "F." (Id.). Plaintiff stated that the "F" was in Reading. (Id.). Plaintiff testified that he has a teacher who helps him with reading. (Tr. 43). Plaintiff stated that he is unable to read tests. (Id.).

Plaintiff testified that the school nurse gives him his medication during the week. (Id.). Plaintiff stated that he takes his medication at home on the weekends. (Id.). Plaintiff testified that he was not sure why he took medication, although he thought it might be because he gets "too excited." (Id.). Plaintiff stated that he always takes his medication, even during the summer.

(Id.).

Plaintiff testified that he planned to start playing football soon after the hearing.  (Tr. 44).

Plaintiff stated that he was participating in a program in which he was given parts to a bicycle and instructed on how to repair the bicycle.  (Id.).  Plaintiff testified that he enjoyed repairing bicycles.  (Id.).  Plaintiff stated that he had his own bicycle, and rides it every day.  (Id.).

Plaintiff testified that he did homework every day when he came home from school.  (Id.).  Plaintiff stated that his older brother helped him with his homework.  (Id.).

The ALJ next examined Ms. Mayo, who testified that she lived in a townhouse with her five children.  (Tr. 46).  Ms. Mayo stated that none of her other children received disability benefits at the time of the hearing, although her oldest son received them in the past.  (Id.).

Ms. Mayo testified that plaintiff sleeps in a room by himself.  (Id.).  Ms. Mayo stated that plaintiff also spends the night at his grandmother's house frequently.  (Id.).

Ms. Mayo testified that plaintiff occasionally helps her around the house by taking out the trash.  (Id.).  Ms. Mayo stated that she does not ask plaintiff to do any major tasks because he will "mess it up."  (Id.).

Ms. Mayo testified that she used to have a puppy, but it died.  (Id.).  Ms. Mayo stated that she took care of the puppy when it was alive.  (Tr. 47).

Ms. Mayo testified that she did not work.  (Id.).  Ms. Mayo stated that she last worked in late 2007 or early 2008.  (Id.).

Ms. Mayo testified that she and her children lived at plaintiff's grandmother's house for a period of time but the grandmother never had custody of plaintiff.  (Id.).  Ms. Mayo stated that plaintiff's father died approximately one year prior to the hearing.  (Tr. 48).

-4-

Ms. Mayo testified that plaintiff was in fourth grade.  (Id.).  Ms. Mayo stated that plaintiff should be in fifth grade, but he was held back.  (Id.).  Ms. Mayo testified that plaintiff received all "F"s in fourth grade.  (Id.).  Ms. Mayo stated that she talked to plaintiff's teachers and they told her that plaintiff was "way off."  (Id.).  Ms. Mayo testified that she had been trying to get help for plaintiff since he started school.  (Id.).  Ms. Mayo stated that plaintiff took all special education classes, except for Music and Gym.  (Tr. 49).

Ms. Mayo testified that plaintiff had been taking Concerta[1] for about one year.  (Id.).  Ms. Mayo stated that plaintiff takes medication three times a day-in the morning, at lunch, and before going to bed.  (Id.).  Ms. Mayo testified that plaintiff's lunch dosage is administered by his school. (Tr. 50).  Ms. Mayo stated that plaintiff's dosage had recently been increased due to plaintiff's uncontrollable behavior.  (Id.).  Ms. Mayo testified that plaintiff takes his medication year-round. (Id.).

Ms. Mayo stated that her other children received good grades.  (Id.).

Ms. Mayo testified that plaintiff had friends in the community.  (Id.).  Ms. Mayo stated that she only knew one of plaintiff's friends.  (Id.).

Ms. Mayo testified that plaintiff rides his bicycle most days.  (Id.).  Ms. Mayo stated that plaintiff goes to the park with his grandmother and his cousin.  (Tr. 51).

Ms. Mayo testified that plaintiff gets along really well with his siblings.  (Id.).  Ms. Mayo stated that plaintiff occasionally fights with his neighborhood friends.  (Id.).

Ms. Mayo testified that plaintiff has gotten in trouble at school on many occasions for

---

[1]Concerta is indicated for the treatment of ADHD.  See Physician's Desk Reference (PDR), 1925 (63rd Ed. 2009).

fighting and other conduct.  (Id.).  Ms. Mayo stated that plaintiff is sneaky, and has taken items from school home with him.  (Id.).  Ms. Mayo testified that plaintiff has to be watched constantly. (Tr. 52).

Ms. Mayo stated that her only income was food stamps.  (Id.).  Ms. Mayo testified that her twenty-year-old son was not working.  (Id.).

Ms. Mayo stated that her children occasionally spend the weekend at her mother's house. (Id.).

Ms. Mayo testified that plaintiff was having problems at school academically, and with his behavior.  (Id.).  Ms. Mayo stated that plaintiff is working at the first or second grade level.  (Id.). Ms. Mayo testified that plaintiff writes his letters backwards, and is unable to focus.  (Id.).  Ms. Mayo stated that plaintiff spends part of his day in the regular classroom, and part of his day in the special education classroom.  (Tr. 53).

The ALJ pointed out that plaintiff's medical records indicate that plaintiff's grandmother had custody of plaintiff since he was three years old.  (Id.).  Ms. Mayo testified that this was inaccurate.  (Id.).  Ms. Mayo stated that she and her children lived with plaintiff's paternal grandmother when plaintiff's father was alive, but the grandmother never had legal custody of plaintiff.  (Id.).  Ms. Mayo testified that both of plaintiff's grandmothers take him to doctor appointments.  (Tr. 54).

Ms. Mayo stated that plaintiff gets in trouble at school for not staying in his seat, running out of the building, and not doing his work.  (Id.).  Ms. Mayo testified that plaintiff just scribbles rather than complete his work assignments.  (Id.).  Ms. Mayo stated that she helps plaintiff with his homework.  (Id.).  Ms. Mayo testified that she occasionally goes to school and sits with

plaintiff.  (Id.).  Ms. Mayo stated that she believes plaintiff should be in special education classes all day.  (Tr. 55).

Ms. Mayo testified that her older children occasionally baby-sit plaintiff.  (Id.).

Plaintiff's attorney stated that new evidence he submitted revealed significant findings. (Id.).  Plaintiff's attorney noted that plaintiff tested at the kindergarten level.  (Id.).  Plaintiff's attorney pointed out that plaintiff's teachers indicated that plaintiff has severe problems.  (Id.). Plaintiff's attorney stated that this evidence reveals that plaintiff has marked impairments in acquiring and using information; and in attending to and completing tasks.  (Tr. 57-58).

**B.    Relevant Medical Records**

The record reveals that plaintiff received treatment at Grace Hill Neighborhood Health Centers ("Grace Hill") from April 2008 through June 2009.  On April 10, 2008, plaintiff underwent ADHD[2] testing, which rated plaintiff's level of inattention at nine out of nine, and his level of hyperactivity at eight out of nine.  (Tr. 273).

Plaintiff saw Alison Burner, M.A., Licensed Psychologist, on May 9, 2008, for a psychological consultation at the request of the state agency.  (Tr. 264-66).  It was noted that plaintiff was nine years of age, attended third grade, and did not receive special education services.  (Tr. 264).  During the examination, plaintiff was able to sit quietly and attentively, and was cooperative.  (Tr. 265).  Ms. Burner noted that psychomotor agitation was present.  (Id.). Ms. Burner found that, overall, plaintiff's attention and concentration were adequate and no

---

[2]A behavioral disorder manifested by developmentally inappropriate degrees of inattentiveness (short attention span, distractability, inability to complete tasks, difficulty in following directions), impulsiveness (acting without due reflection), and hyperactivity (restlessness, fidgeting, squirming, excessive loquacity).  Stedman's Medical Dictionary, 568 (28th Ed. 2006).

symptoms of ADHD were observed, although symptoms were reported by plaintiff's mother and

the school.  (Id.).  No difficulties of adaptive functioning were reported.  (Id.).  Plaintiff was able

to care for himself and his hygiene.  (Id.).  Plaintiff was able to do age appropriate chores with

supervision.  (Tr. 266).  Plaintiff's mother reported that plaintiff had appropriate peer

relationships and had friends at school.  (Id.).  Plaintiff appeared to be of low average to

borderline intellectual functioning based upon testing results.  (Id.).  Plaintiff's social judgment

and reasoning, abstract thinking, mental control, and short and long-term memory were in the low

average range.  (Id.).  Plaintiff was not receiving medication for ADHD, and had never been

diagnosed.  (Id.).  Ms. Burner diagnosed plaintiff with ADHD, combined type, based on plaintiff's

mother's reports and school records.  (Id.).  She assessed a GAF score[3] of 65.[4]  (Id.).  Ms. Burner

indicated that, with appropriate medical intervention and educational support, plaintiff should be

able to function adequately within society at a level commensurate with his ability.  (Id.).  Ms.

Burner stated that, without medication, plaintiff's impulsivity and hyperactivity would likely

negatively impact his social, emotional, educational, and adaptive functioning to a mild or

moderate degree, and would likely interfere with his peer relations and educational functioning.

(Id.).

---

[3]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[4]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV at 32.

Terry Dunn, Ph.D. completed a Childhood Disability Evaluation Form on June 5, 2008. (Tr. 267-72).  Dr. Dunn found that plaintiff's impairments were severe but did not meet or medically equal, or functionally equal the listings.  (Tr. 267).  Dr. Dunn expressed the opinion that plaintiff had less than marked limitations in the domain of "Attending and Completing Tasks," but had no limitations in any other domain.  (Tr. 269).

Plaintiff saw Sharon West, Ph.D. at Grace Hill on June 3, 2008, for an initial assessment. (Tr. 171-72).  Plaintiff was accompanied by his paternal grandmother, who reported that plaintiff told her he wanted to talk to someone.  (Tr. 171).  It was noted that plaintiff had extremely poor impulse control, did "whatever pops into his head," and was frequently in trouble in school.  (Id.). Plaintiff was struggling academically, was unable to read, and was behind in every subject.  (Id.). It was noted that plaintiff was born drug exposed, and sustained a head injury after being struck by a car at the age of three.  (Id.).  Upon examination, plaintiff was difficult to engage, evidenced poor eye contact, and admitted to suicidal ideation when he was under stress.  (Tr. 171-72). Plaintiff denied having a suicide plan, although he indicated that he wished that he were not alive. (Tr. 172).  Plaintiff had a history of difficulty focusing, staying on task, and following directions; and was easily distracted and frustrated.  (Id.).  Dr. West found that plaintiff's memory, judgment, and insight were poor.  (Id.).  Dr. West diagnosed plaintiff with ADHD, and assessed a GAF score of 60.[5]  (Id.).  Dr. West recommended improved school functioning through behavior modification.  (Id.).

Plaintiff saw neurologist Shulamit Portnoy, M.D. at Grace Hill on June 22, 2008.  (Tr.

_____

[5]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

173-74).  Plaintiff was accompanied by his paternal grandmother.  (Id.).  Plaintiff's grandmother
reported that plaintiff was fidgety, unable to sit still, daydreams too much, is easily distracted, has
trouble concentrating, fidgets/squirms, talks too much, blurts out answers, interrupts/intrudes
others' conversations, is impatient, feels sad, worries a lot, is preoccupied with memories about
his father, fights with other children, is noncompliant with rules, teases others, blames others for
his troubles, refuses to share, is aggressive, is verbally hostile, voices homicidal threats, and has
tantrums several times a day.  (Tr. 173).  Plaintiff was taking no medications.  (Id.).  It was noted
that plaintiff attained all developmental milestones on time, and was currently in regular classes,
although he may need to repeat third grade.  (Id.).  Dr. Portnoy noted that plaintiff had sustained
splenic and liver lacerations, kidney hematomas, and superficial abrasions after being struck by a
car in 2002.  (Id.).  Upon examination, plaintiff was calm, his affect was constricted, and
plaintiff's speech was normal.  (Tr. 174).  Plaintiff's responses were one word, and plaintiff often
only nodded or shook his head.  (Id.).  Dr. Portnoy diagnosed plaintiff with ADHD and ODD.[6]
(Id.).  Dr. Portnoy noted that plaintiff exhibited mood disorder symptoms in the context of
adjustment disorder,[7] and that he had problems with primary support and bereavement.  (Id.).  Dr.
Portnoy deferred medications and recommended continued counseling with Dr. West.  (Id.).

---

[6]Oppositional defiant disorder ("ODD") is a disorder of childhood or adolescence
characterized by a recurrent pattern of negativistic, hostile, and disobedient behavior toward
authority figures.  Stedman's at 570.

[7]A disorder the essential feature of which is a maladaptive reaction to an identifiable
psychological stress, or stressors, that occurs within weeks of the onset of the stressors and
persists for as long as six months; the maladaptive nature of the reaction is indicated by
impairment in occupational (including school) functioning, or in usual social activities or
relationships with others, or with symptoms that are in excess of a normal or expectable reaction
to the stressor.  Stedman's at 567.

Plaintiff saw Dr. Portnoy on July 24, 2008, at which time plaintiff was calm, made fair eye contact, and had normal speech.  (Tr. 277).  Plaintiff's responses were one word, and plaintiff often only nodded or shook his head.  (Id.).  Plaintiff's affect was constricted.  (Id.).  Dr. Portnoy's diagnosis remained unchanged.  (Id.).

Records from Grace Hill dated October 10, 2008, reveal that testing based on plaintiff's teachers' responses indicated significant inattentiveness, hyperactivity, oppositional-defiant disorder, and conduct disorder.[8]  (Tr. 175-76).  Plaintiff's Art teacher noted that plaintiff "walks in and out of my class room during instruction.  He touches the students and throws crayons at them."  (Tr. 176).

Plaintiff saw social worker Mary Peterson at Grace Hill on November 21, 2008, at which time plaintiff's grandmother reported that plaintiff had just started a new school, his third school that year.  (Tr. 280).  The social worker indicated that she would compose a letter to support plaintiff's grandmother's request for psycho-educational testing.  (Id.).  On January 13, 2009, plaintiff's grandmother brought a copy of a diagnostic evaluation completed by the Special School District in November 2007, in which it was found that plaintiff did not qualify for special education services at that time.  (Tr. 288).  Ms. Peterson indicated that plaintiff's grandmother planned to pursue special education services for plaintiff.  (Id.).

Plaintiff saw Dr. Portnoy on January 13, 2009, at which time it was noted that plaintiff exhibited ongoing behavioral concerns.  (Tr. 289).  Dr. Portnoy noted that plaintiff engaged in

---

[8]A mental disorder of childhood or adolescence characterized by a persistent pattern of violating societal norms and the rights of others; children with the disorder may exhibit physical aggression, cruelty to animals, vandalism, robbery, truancy, cheating, and lying.  Stedman's at 568.

-11-

fights on the bus, and was suspended from school.  (Id.).  Upon examination, plaintiff was alert, intrusive, and had an immature affect.  (Tr. 290).  Plaintiff answered questions nodding or shaking his head, or in brief primitive sentences.  (Id.).  Plaintiff's speech was fast-paced, and was less than 100 percent intelligible, although with redirection, plaintiff talked slower with better intelligibility. (Id.).  Dr. Portnoy's assessment was ADHD, ODD, low average range of IQ, mood disorder symptoms per history, and problems with primary support.  (Id.).  Dr. Portnoy recommended a trial of Concerta.  (Id.).

Plaintiff saw Dr. Portnoy on March 23, 2009, at which time no substantial improvement was noted according to plaintiff's paternal grandmother and plaintiff's teachers.  (Tr. 299).  It was noted that in-school suspensions had been imposed repeatedly, but no out-of-school suspensions. (Id.).  Plaintiff's learning difficulties persisted, and plaintiff was not receiving special education services.  (Id.).  Dr. Portnoy increased plaintiff's dosage of Concerta.  (Tr. 300).

Plaintiff saw Dr. West on April 22, 2009, at which time Dr. West found that plaintiff continued to have "extremely poor impulse control."  (Tr. 312).  Dr. West noted that plaintiff had just returned to school following a three-day suspension for being very disruptive.  (Id.).  Plaintiff ran from the teacher and screamed over the banister.  (Id.).  Dr. West noted that plaintiff tends to regress into baby talk and does not seem to comprehend, although during play therapy he seems more cognitively intuned to what is going on.  (Id.).

Plaintiff also saw Dr. Portnoy on April 22, 2009, at which time Dr. Portnoy stated that plaintiff exhibited significant residual impulsivity, and that he had been suspended for running in the hallways.  (Tr. 310).  Dr. Portnoy noted that plaintiff had engaged legal counsel and was contesting the denial of special education services.  (Id.).  Dr. Portnoy increased plaintiff's dosage

-12-

of Concerta, and recommended that plaintiff pursue special education services.  (Tr. 311).

Plaintiff saw Dr. Portnoy on June 1, 2009, for ongoing concerns about ADHD symptoms at school.  (Tr. 307).  Dr. Portnoy noted that plaintiff had been reevaluated at school, and would be receiving special education services starting the next year.  (Id.).  Plaintiff was repeating the current grade and was attending summer school.  (Id.).  Dr. Portnoy continued plaintiff's medication.  (Tr. 308).

## C.   <u>School Records</u>

Plaintiff's mother reported at a pre-evaluation conference on October 23, 2007 that plaintiff struggled with all academic subjects.  (Tr. 103).  Plaintiff wrote letters and numbers backward, and was unable to read books on his own.  (Id.).  Plaintiff was unable to do any work by himself.  (Id.).  Plaintiff was unable to sit still, needed frequent redirection, and was easily distracted.  (Id.).  Plaintiff's first quarter grades were: Reading: F, Spelling: F, Language: F, Mathematics: F, and Science: D.  (Id.).

Plaintiff underwent a multi-disciplinary evaluation on November 20, 2007, which revealed that plaintiff did not meet the Missouri Department of Elementary and Secondary Education's (DESE) criteria for any educational diagnosis, and was not eligible for special education services.  (Tr. 185).  It was noted that plaintiff was easily distracted by external and internal stimuli and did require frequent restructuring, refocusing, and repetition in order to attend and respond to test items.  (Id.).  Plaintiff's activity level was judged to be outside normal limits.  (Id.).  Testing revealed overall cognitive functioning within the low average range of intelligence.  (Id.).  Academic concerns were noted in the areas of Reading, Mathematics, and Written Expression.  (Tr. 187).  Plaintiff's academic skills were within cognitive expectancy, but below grade level.

(Id.).  Plaintiff exhibited significant task focus concerns.  (Tr. 188).  It was noted that plaintiff was impulsive, easily distracted, hyperactive, and inattentive, both at home and at school.  (Id.).  It was noted that, although plaintiff did not qualify for special education support, he would benefit from visual cues, extra time, oral testing, frequent redirection, and a modified curriculum.  (Id.).

A report card from the 2008-2009 school year from the St. Louis Public Schools indicates that plaintiff received "F" s in all subjects.  (Tr. 148-49).

Plaintiff received a three-day out-of-school suspension on September 8, 2008, for punching a student.  (Tr. 168).

Plaintiff received a three-day out-of-school suspension on January 14, 2009, for physically attacking another student.  (Tr. 163).

Larry Ellis, plaintiff's fourth grade teacher, completed an assessment on February 12, 2009.  (Tr. 169-70).  Mr. Ellis indicated that plaintiff "very often" exhibited the following symptoms: fails to give attention to details; has difficulty sustaining attention to tasks; does not seem to listen when spoken to directly; does not follow through on instructions and fails to finish schoolwork; has difficulty organizing tasks and activities; avoids, dislikes or is reluctant to engage in tasks that require sustained mental effort; loses things necessary for tasks; is easily distracted by extraneous stimuli; is forgetful in daily activities; fidgets; leaves seat in classroom; runs about or climbs excessively; has difficulty playing quietly; is "on the go" or often acts as if "driven by a motor;" talks excessively; blurts out answers before questions have been completed; has difficulty waiting in line; interrupts or intrudes on others; is fearful, anxious or worried; is self-conscious or easily embarrassed; and is afraid to try new things for fear of making mistakes.  (Tr. 169).  Mr. Ellis found that plaintiff exhibited the following symptoms "often:"  loses temper; actively defies

-14-

or refuses to comply with adult's requests; is angry or resentful; is spiteful and vindictive; is physically cruel to people; and feels worthless or inferior.  (Tr. 169-70).  Mr. Ellis also indicated that plaintiff displayed the following symptoms "occasionally:"  bullies, threatens, or intimidates others; initiates physical fights; lies to obtain goods for favors or to avoid obligations; and deliberately destroys others' property.  (Id.).  Mr. Ellis found that plaintiff's academic performance in Reading, Mathematics, and Written Expression were problematic.  (Tr. 170).  Mr. Ellis indicated that the following classroom behavior was problematic: relationship with peers, following directions, disrupting class, assignment completion, and organizational skills.  (Id.).  Mr. Ellis stated "[plaintiff] is an educationally unmotivated nonreader and writer who seems to be a good kid who's self-conscious and embarrassed that he cannot successfully function in a regular 4th grade classroom."  (Id.).

On February 25, 2009, Mr. Ellis completed an "Office Referral" in which he stated that plaintiff was "basically a good kid that has unfortunately fallen through the cracks."  (Tr. 153). Mr. Ellis indicated that plaintiff makes animal noises, mimics different gunshot sounds, horseplays, fights, walks out of the classroom, and "basically does whatever he decides to do."  (Id.).  Mr. Ellis indicated that he believed plaintiff was "acting out constantly because he 'simply' cannot work at the 4th grade level.  Other than that, he's a little darling!"  (Id.).

Plaintiff received an out-of-school suspension on April 15, 2009, for running throughout the hallway, yelling over the banister, hiding in the boys' restroom, and disobeying authority.  (Tr. 204).

Mr. Ellis completed an evaluation on April 15, 2008, in which he indicated that work habits, classroom behaviors, and interpersonal behaviors were problems.  (Tr. 226).  Mr. Ellis

stated that plaintiff's "lack of basic skills and constantly acting out obviously hinders him from making further academic progress."  (Id.).

Plaintiff received an out-of-school suspension on April 29, 2009, for entering the boys' restroom and punching a third grade student in his jaw.  (Tr. 204).

Plaintiff underwent a Psychological-Educational Assessment conducted by Saint Louis Public Schools on May 11, 2009, due to concerns regarding plaintiff's academic progress.  (Tr. 216-56).  Plaintiff's teacher estimated that plaintiff was functioning at the Pre-K level in Reading, Math, and in Written Expression.  (Tr. 219).  Plaintiff's report card grades reflected continued struggles in all academic areas.  (Id.).  Plaintiff underwent intelligence testing on May 19, 2009, which revealed a nonverbal IQ of 98, and a percentile of 45, which placed plaintiff in the average range of cognitive ability.  (Tr. 218).  Testing  revealed that plaintiff's adaptive functioning was at the low level.  (Id.).  Plaintiff also underwent academic achievement testing, which revealed that plaintiff was functioning at the kindergarten and first grade level.  (Tr. 220).  It was found that plaintiff was not achieving commensurate with his cognitive ability in Basic Reading, Reading Comprehension, Math Reasoning, Math Calculation, and Written Expression.  (Id.).  It was noted that, although plaintiff's cognitive ability was within the normal range, his achievement significantly lagged behind his ability, thus jeopardizing day-to-day classroom functioning and academic progress.  (Id.).  With regard to social/emotional behavior, it was noted that although plaintiff exhibited some behavior problems in school, these behaviors were a result of his diagnosis of ADHD, which impaired his ability to function socially, academically, and at home.  (Tr. 225). Plaintiff was described by a teacher as a "very personable young man," who was not disrespectful,

but acted out because he was unable to perform his school work.  (Id.).  It was concluded that

plaintiff's ADHD impaired plaintiff's ability to function socially, academically, and emotionally in

the school setting; and that plaintiff required special education and related services.  (Tr. 231).


Plaintiff received an out-of-school suspension on May 13, 2009, for running around the

halls and playing in adult restrooms, and then refusing to enter the in-school suspension room.

(Tr. 204).

On August 25, 2009, plaintiff's school counselor stated that plaintiff "needs to be

redirected by staff to remain quiet and focus on the speaker.  He is easily distracted by the

movement of others."  (Tr. 226).

## The ALJ's Determination

The ALJ made the following findings:

1.     The claimant was nine years old on March 3, 2008, and is now ten (in regulatory
       parlance, a school-age child) (20 C.F.R. 416.926a(g)(2)).

2.     The claimant, obviously, has not engaged in substantial gainful activity since
       March 3, 2008 (20 C.F.R. 416.924(b) and 416.971 et seq.).

3.     The claimant has the following severe impairment: an attention deficit hyperactivity
       disorder (ADHD) (the "learning disability" is considered a symptom of ADHD)
       (20 CFR 416.924(c)).

4.     The claimant's condition has not met or medically equaled a listing in 20 CFR
       Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.     The claimant's condition has not functionally equaled a listing (20 C.F.R.
       416.924(d) and 416.926a).

6.     The claimant has not been disabled in accordance with the Social Security Act (20

CFR 416.924(a)).

(Tr. 26-28).

The ALJ's final decision reads as follows:

The claimant's application for supplemental security income, protectively filed on March 3, 2008, is denied.  The claimant has not been disabled under section 1614(a)(3)(C) of the Social Security Act.

(Tr. 28).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing

test to evidence which is contrary." <u>Burress v. Apfel</u>, 141 F.3d 875, 878 (8th Cir. 1998).  The

analysis required has been described as a "searching inquiry."  <u>Id.</u>

**B.      The Determination of Disability**

      A child is considered disabled if that child "has a medically determinable physical or mental

impairment, which results in marked and severe functional limitations" and which lasts for a

period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(C)(i),(ii).  The Commissioner has

established a three-step process for determining whether a child is disabled under the Social

Security Act.  <u>See</u>  20 C.F.R. § 416.924.  Under the first step, it is determined whether the child

was engaged in substantial gainful activity.  If substantial gainful activity is being performed, then

a finding of no disability is warranted.  <u>See</u> 20 C.F.R. §§ 416.924(b).  Next, it is determined

whether the child's impairments are severe.  <u>See</u> 20 C.F.R. §§ 416.924(c).  If a severe impairment

is found, the next issue is whether the child's impairment meets or medically equals a listed

impairment found in Appendix One to 20 C.F.R. 404.  <u>See</u> 20 C.F.R. §§ 416.924(d); 20 C.F.R.

pt. 404, subpt. P, App. 1.  If it is determined that the impairment does not meet or medically equal

a listing, then the final consideration is whether the child's impairment "functionally equals" a

listed impairment.  <u>See</u> 20 C.F.R. § 416.924(d).

      An ALJ is to evaluate, in determining functional equivalence, a child's functional

limitations in: (1) acquiring and using information, (2) attending and completing tasks, (3)

interacting and relating with others, (4) moving about and manipulating objects, (5) caring for

himself/herself, and (6) health and physical well-being.  <u>See</u> 20 C.F.R. § 416.926a (b)(1)(I)-(vi).

A medically determinable impairment or combination of impairments functionally equals a listed

-19-

impairment if it results in "marked" limitations in two domains or an "extreme" limitation in one

domain.  See 20 C.F.R. § 416.926a(d).

A "marked" limitation is a limitation which is "more than moderate" but "less than

extreme."  20 C.F.R. § 416.926a (e)(2)(I).  A "marked" limitation can also be "equivalent to

standardized testing with scores that are at least two, but less than three, standard deviations

below the mean."  Id.

An "extreme" limitation is "more than marked," and is given "to the worst limitations,"

although it need not necessarily mean a total lack or loss of ability to function.  20 CF.R. §

416.926a(e)(3)(I).

**C.    Plaintiff's Claims on Appeal**

Plaintiff argues that the ALJ failed to point to evidence supporting his decision that

plaintiff's condition did not meet, equal, or functionally equal a listing.  Plaintiff contends that the

ALJ erred in determining plaintiff's impairment did not functionally equal a listing because

plaintiff had marked impairments in the domains of attending or completing tasks, and in

interacting and relating to others.  Plaintiff also argues that the ALJ erred in failing to articulate a

sufficient rationale for the conclusion that plaintiff's condition did not meet or equal a listing

based upon a failure to meet the "B" criteria.  The undersigned will discuss plaintiff's claims in

turn.

**I.     Functional Equivalence**

The ALJ found that plaintiff had a marked limitation in his ability to acquire and use

information; less than marked limitations in his ability to attend to and complete tasks, and interact

and relate with others; and no limitations in his ability to move about, manipulate objects, or care

for himself.  (Tr. 27-28).  Plaintiff challenges the ALJ's findings that plaintiff had less than marked

limitations in his ability to attend to and complete tasks, and interact and relate with others.

**1.      Attending and Completing Tasks**

The ALJ found that plaintiff's ability to attend to and complete tasks has not been

markedly or extremely limited.  (Tr. 27).

The domain of attending to and completing tasks considers how well the child focuses and

maintains attention; begins, carries through, and finishes activities (including the pace activities are

performed); and the ease with which the child changes activities.  See 20 C.F.R. § 416.926a(h).

School age children (age 6 to age to 12), should be able to focus their attention in a variety of

situations in order to follow directions, remember and organize school materials, and complete

classroom and homework assignments.  See id. at § 416.926a(h)(2)(iv).  The child should be able

to concentrate on details and not make careless mistakes in his or her work, change his or her

activities or routines without distracting others, and stay on task and in place when appropriate.

See id.  The child should also be able to sustain his or her attention well enough to participate in

group sports, read, and complete family chores.  See id.

The ALJ first acknowledged that plaintiff's mother testified that plaintiff was "way out of

focus," and that he does not remain in his seat at school.  (Tr. 27, 52).  The ALJ also noted that

plaintiff's teacher, Mr. Ellis, stated that plaintiff has a short attention span, is easily distracted, is

reluctant to begin tasks, and does not complete tasks, needs to have directions repeated, works

slowly, has difficulty working independently, and performs work in a careless manner.  (Tr. 27,

217).

The ALJ pointed out that consultative psychologist Alison Burner, however, assessed a GAF score of 65 in May 2008, despite plaintiff's diagnosis of ADHD. (Tr. 27, 266). The ALJ noted that Ms. Burner found that plaintiff demonstrated psychomotor agitation, but she also found that plaintiff had adequate attention and concentration overall. (Tr. 27, 265). The ALJ next stated that treating psychologist Sharon West diagnosed plaintiff with ADHD, but assessed a GAF score of 60 in June 2008. (Tr. 27, 172). The ALJ noted that state agency psychologist Terry Dunn reviewed the record in June 2008, and concluded that plaintiff did not have a marked or extreme limitation in this domain. (Tr. 27, 269). The ALJ stated that Dr. Portnoy performed an evaluation in July 2008, in which he noted that plaintiff's activity level was calm. (Tr. 27, 277). The ALJ noted that, although Dr. Portnoy indicated that plaintiff exhibited fast-paced speech during a January 2009 evaluation, he also noted that plaintiff talked slower upon redirection. (Tr. 27, 290). Finally, the ALJ pointed out that, in March 2009, Dr. Portnoy reported that plaintiff had a favorable response to Adderall.[9] (Tr. 27). The ALJ concluded that the above-cited medical evidence was "more persuasive because it is from individuals with credentials in the psychological realm." (Id.).

Plaintiff contends that the ALJ erred in assigning more weight to the medical evidence, and ignoring all the evidence favorable to plaintiff's claim, including the school records, Dr. Portnoy's diagnoses, and the statements of plaintiff's mother and grandmother.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the

_____

[9]Adderall is indicated for the treatment of ADHD. See PDR at 3013.

various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir.

2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating

physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108,

1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a

treating physician's opinion will typically be given controlling weight when the opinion is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010,

1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original).

Such opinions, however, do "not automatically control, since the record must be evaluated as a

whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may

be discounted or disregarded where other "medical assessments 'are supported by better or more

thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

"The opinion of a consulting physician who examines a claimant once or not at all does not

generally constitute substantial evidence." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

     In support of his decision that plaintiff had a less than marked limitation in the ability to

attend and complete tasks, the ALJ first cited the opinion of one-time consulting psychologist Ms.

Burner. (Tr. 27). Specifically, Ms. Burner found that plaintiff had adequate attention and

concentration overall during his examination. (Tr. 27, 265). Ms. Burner also noted, however,

that symptoms of ADHD were reported by plaintiff's mother and the school. (Tr. 265). In

addition, Ms. Burner examined plaintiff in May 2008, approximately sixteen months prior to the

administrative hearing. As such, Ms. Burner did not have the benefit of subsequent medical

evidence and school evidence, which revealed significant deficits in plaintiff's attention and concentration.

The ALJ also cited the opinion of state agency psychologist Dr. Dunn, who reviewed the record in June 2008, and concluded that plaintiff did not have a marked or extreme limitation in this domain. (Tr. 27, 269). Dr. Dunn did not examine plaintiff. Further, similar to Ms. Burner, Dr. Dunn's review of the record occurred approximately fifteen months prior to the hearing and did not include a significant amount of relevant evidence. As such, this opinion was entitled to little weight.

The ALJ next pointed to evidence from plaintiff's treating psychologist, Dr. West. (Tr. 27). Specifically, the ALJ noted that in June 2008, Dr. West diagnosed plaintiff with ADHD, but also assessed a GAF score of 60, which was indicative of only moderate impairment. (Tr. 27, 172). First, the Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs." 65 Fed.Reg. 50764-65, 2000 WL 1173632 (Aug. 21, 2000). See Jones v. Astrue, 619 F.3d 963, 973-74 (8th Cir. 2010). "An ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it." Jones, 619 F.3d at 974. Although Dr. West assessed a GAF score of 60 on June 2008, Dr. West also noted that plaintiff had "extremely poor impulse control;" did "whatever pops into his head;" was struggling academically; was difficult to engage during the examination; evidenced poor eye contact; reported suicidal ideation; had a history of difficulty focusing, staying on task, and following directions; and was easily distracted and frustrated. (Tr. 171-72). Further, on April 22, 2009, Dr. West found that plaintiff continued to have "extremely poor impulse control." (Tr.

-24-

312).  Dr. West noted that plaintiff had recently been suspended from school for being disruptive and would not be redirected.  (Id.).  In sum, although Dr. West assessed a GAF score of 60 in June 2008, her treatment notes reveal that plaintiff experienced significant limitations in his ability to attend and complete tasks.

The ALJ also cited evidence from plaintiff's treating neurologist, Dr. Portnoy.  The ALJ noted that Dr. Portnoy found that plaintiff's activity level was calm in July 2008, and that plaintiff talked slower upon redirection in January 2009.  (Tr. 27, 27, 290).

Dr. Portnoy also indicated that plaintiff's grandmother reported the following symptoms at plaintiff's June 2008 visit: plaintiff was fidgety, unable to sit still, daydreams too much, is easily distracted, has trouble concentrating, fidgets/squirms, talks too much, blurts out answers, interrupts/intrudes others' conversations, is impatient, feels sad, worries a lot, is preoccupied with memories about his father, fights with other children, is noncompliant with rules, teases others, blames others for his troubles, refuses to share, is aggressive, is verbally hostile, voices homicidal threats, and has tantrums several times a day.  (Tr. 173).  Further, in January 2009, Dr. Portnoy noted that plaintiff exhibited ongoing behavioral concerns, including engaging in fights on the bus, and was suspended from school.  (Tr. 289).  Plaintiff answered questions nodding or shaking his head, or in brief, primitive sentences.  (Tr. 290).  The ALJ did not discuss this evidence.

The ALJ also stated that Dr. Portnoy reported that plaintiff had a favorable response to Adderall in March 2009.  (Tr. 27).  The treatment note to which the ALJ refers, however, does not relate to plaintiff.  This treatment note pertains to "Byron, a 6 YO boy," and was mistakenly included in plaintiff's records  (Tr. 298).  With regard to plaintiff, in March 2009, Dr. Portnoy

found "no substantial improvement," according to plaintiff's parent and teacher reports.  (Tr. 299).  Dr. Portnoy noted that in-school suspensions had been imposed repeatedly and plaintiff's learning difficulties persisted.  (Id.).  As such, the ALJ's determination is not supported by Dr. Portnoy's treatment notes.

The ALJ's determination is also not supported by the testimony of plaintiff's mother, plaintiff's school records, or the remainder of the record.  The ALJ acknowledged that plaintiff's teacher, Mr. Ellis, indicated that plaintiff had a short attention span, is easily distracted, is reluctant to begin tasks, and does not complete tasks, needs to have directions repeated, works slowly, has difficulty working independently, and performs work in a careless manner.  (Tr. 27, 217).  The ALJ also noted that plaintiff's mother testified that plaintiff was "way out of focus," and that he did not remain in his seat at school.  (Tr. 27, 52).  In addition, plaintiff underwent ADHD testing in April 2008, which rated plaintiff's level of inattention at nine out of nine, and his level of hyperactivity at eight out of nine.  (Tr. 273).  Testing performed in October 2008 based on plaintiff's teachers' responses indicated significant inattentiveness and hyperactivity.  (Tr. 175-76).  Further, the assessment conducted by Saint Louis Public Schools in May 2009 revealed plaintiff was functioning at the kindergarten and first grade level.  (Tr. 220).  Finally, in August 2009, plaintiff's school counselor stated that plaintiff "needs to be redirected by staff to remain quiet and focus.  He is easily distracted by the movement of others."  (Tr. 226).  Despite the evidence cited above, the ALJ concluded that the medical evidence was more persuasive because it was from individuals with psychological credentials.  (Tr. 27).

The Commissioner's regulations for childhood disabilities provide that parents and

-26-

teachers, as well as medical providers, are important sources of information.  20 C.F.R.

§ 416.924a; Richardson ex rel. Richardson v. Massanari, No. C00-2083 MJM, 2001 WL

34152093, *10 (N.D. Iowa Sept. 27, 2001) (stating that under the Commissioner's regulations,

"the observations and opinions of a child's teachers are particularly informative at [the functional

equivalence] step due to the teachers' regular, ongoing interaction with, and observation of, the

child over a sustained period of time").

    The undersigned finds that the ALJ's determination that plaintiff had a less than marked

limitation in the domain of attending to and completing tasks is not supported by substantial

evidence.  The ALJ acknowledged that plaintiff's mother's testimony and plaintiff's school

records revealed significant limitations in plaintiff's ability to attend and complete tasks due to his

ADHD, yet the ALJ found that the medical evidence was more persuasive.  The only medical

evidence supporting the ALJ's decision, however, are the opinions of the two consultative

psychologists.  Both of these consultative psychologists provided their opinions more than a year

prior to the hearing and did not have the benefit of the majority of the records in this case.  The

treatment notes of plaintiff's treating psychologist and treating neurologist reveal plaintiff

exhibited significant symptoms of inattention and inability to focus.  In addition, the ALJ

mistakenly considered treatment notes that did not pertain to plaintiff in analyzing Dr. Portnoy's

records.  As such, the ALJ's conclusion is not supported by substantial evidence.

## 2.    Interacting and Relating With Others

    The ALJ found that plaintiff's ability to interact and relate with others has not been

markedly or extremely limited.  (Tr. 27).  The ALJ noted that plaintiff was suspended for brief

-27-

periods of misbehavior five times during the 2008-09 school year.  (Id.).  The ALJ, however, pointed out that the consultative psychologist found that plaintiff's social judgment was in the average range, and that plaintiff's mother informed the psychologist that plaintiff had appropriate peer relationships.  (Tr. 27-28).  The ALJ noted that Dr. Dunn concluded that plaintiff did not have any limitation in this domain.  (Tr. 28).  Finally, the ALJ stated that Mr. Ellis considered plaintiff respectful and very personable.  (Id.).

This domain considers how well the child initiates and sustains emotional connections with others, develops and uses the language of her community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others.  See 20 C.F.R. § 416.926a(I) (2006).

The undersigned finds that the ALJ's determination that plaintiff's ability to interact and relate with others has not been markedly or extremely limited is supported by substantial evidence.  As the ALJ noted, plaintiff's mother reported to consultative psychologist Ms. Burner that plaintiff had appropriate peer relationships and friends at school.  (Tr. 266).  Mr. Ellis described plaintiff as a "very personable young man," who was not disrespectful.  (Tr. 225).  In addition, plaintiff testified at the hearing that he had many friends in his neighborhood and in his class.  (Tr. 39, 41).  Plaintiff's mother also testified at the hearing that plaintiff had friends in the community, and that plaintiff got along really well with his siblings.  (Tr. 50-51).

As the ALJ pointed out, plaintiff was suspended five times during the 2008-09 school for misbehavior, sometimes involving physical encounters with other students.  Although this evidence would support the opposite conclusion, substantial evidence supports the ALJ's

decision.  As such, the ALJ's decision is not subject to reversal on this basis. See Krogmeier v.

Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal citations omitted) ("As long as substantial

evidence in the record supports the Commissioner's decision, we may not reverse it because

substantial evidence exists in the record that would have supported a contrary outcome.").

## II.    Listing 112.11

Plaintiff also argues that the ALJ erred in failing to articulate a sufficient rationale for the

conclusion that plaintiff's condition did not meet or equal a listing.

The burden of proof is on the plaintiff to establish that his or her impairment meets or

equals a listing.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).  To meet a listing, an

impairment must meet all of the listing's specified criteria.  Id.  An impairment that manifests only

some of these criteria, no matter how severely, does not qualify.  Id. (quoting Sullivan v. Zebley,

493 U.S. 521, 530-31, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990)).  Although it is preferable that

ALJs address a specific listing, failure to do so is not reversible error if the record supports the

overall conclusion.  Pepper ex rel Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003).

The ALJ found that plaintiff's condition did not meet or equal listing 112.11, the listing for

ADHD, because "the medical record does not show satisfaction of the 'B' criteria."  (Tr. 26).

The ALJ provided no further discussion of listing 112.11.

Listing 112.11 sets out the following:

> Attention Deficit Hyperactivity Disorder: Manifested by developmentally
> inappropriate degrees of inattention, impulsiveness, and hyperactivity.
> The required level of severity for these disorders is met when the requirements in
> both A and B are satisfied.

A.  Medically documented findings of all three of the following:
1.  Marked inattention; and
2.  Marked impulsiveness; and
3.  Marked hyperactvity;
And
B.  For...children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

The "B" criteria referenced in 112.02 provide as follows:

For children (age 3 to attainment of age 18), resulting in at least two of the following:
a.  Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests..; or
b.  Marked impairment in age-appropriate social functioning, documented by history and medical findings...; or
c.  Marked impairment in age-appropriate personal functioning, documented by history and medical findings...; or
d.  Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. pt. 404, subpt. P, App. 1.

As previously discussed, the ALJ found that plaintiff's ability to acquire and use information has been markedly limited.  (Tr. 27).  This finding is supported by the overwhelming evidence in the record, specifically plaintiff's school records.  As such, plaintiff appears to meet the first criterion, "Marked impairment in age-appropriate cognitive/communicative function."

Plaintiff argues that he also meets the last criterion, "Marked difficulties in maintaining concentration, persistence, or pace."  The court has found that the ALJ's determination that plaintiff had less than marked limitations in the domain of attending to and completing tasks was not supported by substantial evidence.  The same evidence discussed with regard to this domain

would also tend to support a finding with regard to the last criterion of the listing.  The ALJ, however, provided no discussion of the "B" criteria.   As such, the ALJ's conclusory finding that plaintiff's condition did not meet or equal Listing 112.11 because the "B" criteria are not satisfied is also not supported by substantial evidence.


## Conclusion

In sum, the ALJ erred in failing to articulate a sufficient rationale for his finding that plaintiff's condition did not meet or equal Listing 112.11.  The ALJ also erred in determining that plaintiff's condition did not functionally equal a listing because his finding that plaintiff's ability to attend to and complete tasks has not been markedly or extremely limited is not supported by substantial evidence. For these reasons, this cause will be reversed and remanded to the ALJ for further development in order for the ALJ to properly determine whether plaintiff's condition meets or equals Listing 112.11; and whether plaintiff has a marked or extreme limitation in the domain of attending and completing tasks.  Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.


Dated this  22nd day of March, 2012.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE